IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:02cv540

| | | |
|---|---|---|
| STRATEGIC OUTSOURCING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| CONTINENTAL CASUALTY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

THIS MATTER is before the Court pursuant to motions by Continental Casualty

Company ("CNA") (Doc. No. 163) and Strategic Outsourcing, Inc. ("SOI") (Doc. No. 166) for

judgment as a matter of law, or, in the alternative, for a new trial, pursuant to Federal Rules of

Civil Procedure 50 and 59.  For the reasons discussed below, the Court will DENY both motions.

I.      BACKGROUND

       In December 2002, SOI instituted this breach of contract action after attempts to negotiate

a renewal of its workers' compensation insurance with CNA failed and SOI obtained a substitute

policy from another carrier.  SOI sought damages for the costs of obtaining the replacement

insurance for the time that would have been covered by the agreement with CNA.  The Court's

resolution of cross-motions for summary judgment left two issues remaining for trial: whether

CNA's decision to increase the insurance rates was  objectively reasonable under the contract;

and whether SOI had overpaid or underpaid CNA for premiums during their relationship. (Doc.

No. 108: Memorandum and Order; Vol. I TR at 6).

In March 2006, the Court conducted a six-day trial during which over 200 exhibits were admitted and nearly 20 witnesses testified live or by deposition. After the Court denied the parties' Rule 50 motions, the jury returned a verdict in favor of SOI for approximately $10.5 million on the breach of contract claim and in favor of CNA for $758,345 on the underpayment of premiums. (Doc. No. 151: Jury Verdict). The parties subsequently filed post-trial motions that are currently before the Court.

II.   TRIAL EVIDENCE

   A.   Breach of Contract

   The focus of the breach of contract claim was on a provision that read:

   Additional Locations Or Exposures May Make It Necessary To Re-evaluate Rates,
   Premiums and Plan Factors – If, In Our Opinion, Such Additional Exposures,
   Premiums Anticipated And Prior Losses Represent Significant Changes From
   What Has Been Contemplated Herein.

(Pl. Ex. 18 at SOI 003735).[1]  SOI presented evidence to show that its growth in payroll and locations had not increased CNA's "exposure" significantly from what had been contemplated by the parties. For instance, former SOI CEO Robert Fotsch testified that his company carefully screened its accounts to comply with CNA's rules regarding prohibited occupations and locations. (Vol. I TR at 105-111; Vol. II TR at 308-311).[2]  SOI Vice President of Risk

---

   [1]Plaintiff and Defendant exhibits will be referred to as "Pl. Ex." and "Def. Ex." respectively, followed by Bates page number within the exhibit.

   [2]The transcripts of the trial were filed under the following document numbers:  Vol. I, March 13, 2006 (Doc. No. 152 (a.m.); Doc. No. 164 (p.m.)); Vol. II, March 14, 2006 (Doc. No. 154 (a.m.); Doc. No. 165 (p.m.)); Vol. III, March 15, 2006 (Doc. No. 156 (a.m.); Doc. No. 165-2 (p.m.)); Vol. IV, March 16, 2006 (Doc. No. 157 (a.m.); Doc. No. 165-3 (p.m.)); Vol. V, March 17, 2006 (Doc. No. 158 (a.m.); Doc. No. 165-4 (p.m.)); Vol. VI, March 20, 2006 (Doc. No. 155); Vol. VII, March 21, 2006 (Doc. No. 159).

Management William Michel testified that CNA never voiced objections to SOI's plans for growth in payroll and locations. (Vol. III TR at 790-791). Lisa Dennison, an expert in actuarial science, opined that SOI's mix of business had not become riskier and that there had not been a material shift among the states where SOI operated. (Vol. IV TR at 1004).

CNA countered that SOI's exponential payroll growth and expansion into high-risk states were sufficient to trigger its option to re-evaluate the rates. CNA underwriter Charles Kliche testified that SOI's program originally involved $185 million in payroll with an expected premium of $6.3 million, and an expected loss content of $5 million.[3] (Vol. III TR at 932; Def. Exhibit 44). By December 1999, CNA expected $440 million in payroll with an expected loss of $15.5 million (Vol. III TR at 948; Def. Ex. 507). Charles Pearl, an expert in actuarial science, opined that anticipated premiums would have decreased relative to payroll because of two discount programs that had been added to SOI's account. (Vol. IV TR 1163-1165). CNA underwriter Jeffery Pfluger testified that the combination of the payroll growth, expansion of locations into high-risk states, and loss rates caused CNA to conclude the premium rate in the original agreement could no longer be justified. (Vol. V TR at 1521-1540).

B.      Underpayment/Overpayment of Premiums

CNA asserted a counterclaim that SOI had underpaid premiums during their relationship. CNA Manager of Billing Services Troy Garris testified that there were delays in determining SOI's premiums between 1997 and 2000 because SOI was late in providing payroll audits and subsequently revised those audits. (Vol. V TR at 1281-1282). For example, an audit that

---

[3]Loss content is the amount of loss that can be sustained by the insurance company while still realizing a "reasonable" profit. (Charles Kliche, Vol. III TR at 932).

originally showed $285 million of payroll in the base program was later reduced to $238 million. (Vol. V TR at 1294). The change was attributable to SOI's reclassification of payroll into a discount program with lower rates. (Vol. V TR at 1294-1295). However, CNA provided evidence of an agreement that subjected SOI to a penalty for falling below $250 million in payroll in the base program, which had higher rates. (Vol. V TR at 1295-1297; Pl. Ex. 230: Confirmation Letter at CNA 006542). After factoring overpayments and underpayments between 1996 and 2000, Mr. Garris concluded that SOI owed CNA $602,142. (Def. Ex. 519).

SOI presented evidence that there was no agreement in 1999 that required a minimum payroll of $250 million in the base program and that it had overpaid premiums during the relevant years. William Michel testified that he did not believe the contract changed in any way for the 1999 policy year. (Vol. II TR at 502). Former SOI CFO John Thigpen testified that he did not use a minimum payroll when determining premiums due for the 1999 policy year because he did not believe one applied. (Vol. V TR at 1361). Thus, following SOI's reclassification of payroll into the discount program, he concluded in August 2001 that CNA owed SOI $48,019. (Vol. V TR at 1376-1377; Def. Ex. 339). Without taking into account premiums owed by SOI to CNA for policy years 1996 through 1998, SOI CFO Michael Willson determined that CNA owed SOI $1,758, 465 for overpaid premiums. (Vol. VI TR at 1689, 1703).

III.    DISCUSSION

    A.    Legal Standard

The parties moved for judgment as a matter of law at the close of each other's proof. The parties now move again for judgment as a matter of law on adverse portions of the jury's verdict and the Court's rulings pursuant to Fed. R. Civ. P. 50. In the alternative, the parties move for a new trial or remittitur of damages pursuant to Rule 59.

A jury verdict is "permitted to stand unless, under Rule 50(b), no substantial evidence is presented to support the award . . . or, under Rule 59, the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice." Stamathis v. Flying J, Inc., 389 F.3d 429, 436 (4th Cir. 2004) (quoting Mattison v. Dallas Carrier Corp., 947 F.2d 95, 100 (4th Cir.1991)) (ellipses in original, internal quotations omitted). Judgment as a matter of law is appropriate only when, viewing the evidence in the light most favorable to the nonmoving party, there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. Fed. R. Civ. P. 50(a)(1); Babcock v. BellSouth Advertising and Publishing Corp., 348 F.3d 73, 76 (4th Cir. 2003). Thus, the Court must draw all reasonable inferences in the non-movant's favor without weighing the evidence or assessing the witnesses' credibility and grant judgment as a matter of law only if "there can be but one reasonable conclusion as to the verdict." Varghese v. Honeywell Intern., Inc., 424 F.3d 411, 416 (4th Cir. 2005) (internal quotations and citations omitted). Additionally, a party may move for judgment as a matter of law on a discrete legal issue. Id. at 421.

"In considering a motion for a new trial, a trial judge may weigh the evidence and consider the credibility of the witnesses, and if he finds the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice, he must set aside the verdict, even if supported by substantial evidence, and grant a new trial." Chesapeake Paper Products Co. v. Stone & Webster Engineering Corp., 51 F.3d 1229, 1237 (4th Cir. 1995) (internal quotations and citations omitted). Review of a jury's determination of compensatory damages is limited to the first two prongs of the Rule 59 standard, that is the weight and veracity of the evidence. Knussman v. Maryland, 272 F.3d 625, 639 (4th Cir. 2001).

B.     CNA's Motion (Doc. No. 163)

In its motion for judgment as a matter of law, or, in the alternative, for new trial, CNA essentially raises six issues: (1) the sufficiency of the evidence supporting the jury's verdict in favor of SOI on the breach of contract claim (Doc. No. 163: Motion at ¶¶ 7-15); (2) SOI's conduct during the trial (¶¶ 16-17); (3) the Court's discovery ruling regarding certain witnesses (¶ 18(a)); (4) the Court's refusal to limit damages to ninety days (¶ 18(b)); (5) the Court's exclusion of evidence relating to the extension agreement (¶ 18(c)); and (6) the inclusion of the discount "Admin" and "Solomon Restaurants" programs in the damages calculation (¶ 14).

1.     Sufficiency of the evidence

The parties agree that the contract gave CNA the right to re-evaluate the rates if, in its objectively reasonable opinion, additional locations or exposures, anticipated premiums, and prior losses represented significant changes from what had been contemplated. (Doc. No. 168: CNA Memorandum at 1-3; Doc. No. 192: SOI Resp. at 2). The evidence at trial showed that SOI expanded in locations and payroll during the years in question; however, it does not necessarily follow that CNA's actions were objectively reasonable (Rule 50) or that the jury's verdict was against the clear weight of the evidence (Rule 59).

In light most favorable to SOI and without assessing the credibility of the witnesses, the evidence was sufficient to support the jury's conclusion that CNA was not objectively reasonable in deciding that the growth represented a significant change from what had been contemplated. Lisa Dennison examined SOI's growth in locations in seven states between 1998 and 2000 and determined there had not been a material shift between the states. (Vol. IV TR at 1012). Although SOI had a presence in high-risk states like Texas and California, the minuscule amount of payroll there rendered it statistically insignificant. (Vol. IV TR at 1013-1014). The state with

the largest growth, Georgia, is not considered an expensive state for insurers. (Vol. IV TR at 1015). Ms. Dennison also evaluated SOI's book of business for that time period and found that its risk had declined. (Vol. IV TR at 1009-1010).

Additionally, the jury's verdict was not against the clear weight of the evidence. CNA underwriter Tim Fenton, who was involved in the formation of the agreement in 1998, testified that growth in payroll and losses was expected. (Vol. II TR at 357). SOI CEO Robert Fotsch testified that in meetings CNA representatives John Glancy and Jaqueline Bomar never complained about SOI's growth in payroll or types of clients; only that CNA was losing money on the program. (Vol. I TR at 165-167). Even so, a memorandum written by Ms. Bomar in December 1999 noted that SOI had shifted its client base to lower hazard groups, invested time in loss control, and experienced significant decreases in loss rates. (Pl. Ex. 43). Therefore, neither judgment as a matter of law in favor of CNA nor a new trial is warranted based on the sufficiency of evidence on the breach of contract claim.

2.      SOI's conduct in the trial

CNA argues it is entitled to a new trial to correct intentional misconduct by SOI counsel designed to confuse the jury. (Doc. No. 163: Motion at ¶¶ 16-17). The Court ruled prior to trial that SOI would be prohibited from arguing that the contract called for a rate guaranteed for three years. (Doc. No. 132: Order at ¶ 5). CNA admits there is a meaningful difference between a "guaranteed three-year rate," which implies one rate for three years, and a "three-year guaranteed rate program," which implies a certain type of insurance where there is no element of self-insurance. (Doc. No. 168: CNA Memorandum at 29). CNA accuses SOI of intentionally misusing the legitimate contractual term "guaranteed rate" or "guaranteed cost" to imply the illegitimate position that the $3.40 rate was guaranteed for three years.

While CNA points to numerous examples in the testimony of Robert Fotsch that "repeatedly conflated guarantee and rate," (Doc. No. 168: CNA Memorandum at 30-31), it waived this complaint by failing to object to any of the cited examples when the testimony was offered.[4] United States v. Parodi, 703 F.2d 768, 783 (4th Cir. 1983). When CNA did object to similar testimony by William Hagar, the Court sustained the objection and instructed the jury to disregard that testimony. (Vol. IV TR at 1047). When SOI counsel Robert Elster asked questions of Jeffery Pfluger regarding "a rate for three years," the Court sustained CNA's objections. (Vol. V TR at 1572-1573).

The Court instructed the jury at the conclusion of the case that

> SOI must prove by the preponderance of the evidence that CNA failed to act in an objectionably reasonable manner when invoking the additional locations or exposures clause. The parties have agreed, and the Court has found, that there was no three-year rate guarantee under the applicable contract, but rather a contract a contract [sic] at an agreed-upon rate, subject to CNA's right to review that rate pursuant to the clause I just read. Although there has been some mention of a three-year guaranteed rate, you are required to accept the party's [sic] agreement and the Court's ruling and disregard such language.

(Vol. VI TR at 1904). A jury is presumed to follow a court's instructions. Stamathis v. Flying J. Inc., 389 F.3d 429, 436 (4th Cir. 2004) (citing Richardson v. Marsh, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987) and Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 501 (4th Cir. 2001)). The mere fact a jury finds against an objecting party is not evidence that it ignored a curative instruction. Hinkle v. City of Clarksburg, W.Va., 81 F.3d 416, 426 (4th Cir. 1996).

---

[4]Similarly, CNA waived its objections to SOI's closing arguments by choosing not to object (Doc. No. 168: CNA Memorandum at 33-34). Lifmann v. Carlson Companies, Inc., No. 88-3901, 867 F.2d 609, 1989 WL 5440, at *3 (4th Cir. Jan. 11, 1989) (unpublished).

Here, the Court was disappointed with SOI's counsels' intentional injection of the "three-year guaranteed rate" concept into the case after the Court clearly and repeatedly instructed counsel that it was not an issue. However, such misbehavior does not in itself justify a new trial. The Court specifically instructed the jury to disregard testimony and argument about a "three-year guaranteed rate." As detailed above, the verdict was not against the clear weight of the evidence. The jury's verdict in favor of SOI on the breach of contract claim, but in favor of CNA on the counterclaim, shows that it was not confused by SOI's tactics, but rather conscientiously deliberated according to the Court's instructions. Thus, there was no cumulative effect from the misbehavior. CNA has failed to show that the jury ignored the Court's instruction or that a new trial is required to avoid a miscarriage of justice.

### 3. Discovery Ruling

CNA complains in its Motion that the Court erred as a matter of law by allowing SOI to call two witnesses who were not identified by SOI until shortly before the trial and were not deposed by CNA. (Doc. No. 163: Motion at ¶ 18(a)).[5] SOI listed the two witnesses, Carl Guidice and Michael Willson, as persons with knowledge relevant to the case in its initial disclosures required by Fed. R. Civ. P. 26(a)(1). In accordance with the scheduling order, SOI listed Guidice as a witness expected to be called during trial and Willson to be called if the need arose pursuant to Rule 26(a)(3). At the pretrial conference, CNA argued that the parties had an agreement to disclose all trial witnesses in September 2005 so their depositions could be taken. SOI disputed the existence of such an agreement. Even so, CNA has established no prejudice from SOI's

---

[5]CNA did not address this contention in its supporting Memorandum or Reply. It raised the issue prior to trial in a motion in limine. (Doc. No. 114).

actions.  Both witnesses were effectively cross-examined and SOI complied with Rule 26.

Accordingly, a new trial is not required based on the Court's discovery ruling.

        4.      Damages Period Ruling

      CNA claims the Court erred in refusing to limit damages to ninety days following the

breach, based on a cancellation provision in the contract.[6] (Doc. No. 163: Motion at ¶ 18(b)).

CNA did not plead this defense in its Answer (Doc. No. 6), but rather raised the issue for the first

time in its Statement of Disputed Issues for Trial (Doc. No. 116 at ¶ 5) and Trial Brief (Doc. No.

122 at 8).  After hearing argument at the pretrial conference, the Court invited further briefing on

the issue, which the parties provided on the first day of trial. (Doc. No. 138: SOI's Brief; Doc.

No. 144: CNA's Brief).  The Court ruled the following day that damages were not limited to the

ninety-day period applicable to the cancellation clause. (Vol. II TR at 594-598).

      In making its decision, the Court primarily relied on Chevrolet Motor Co. v. Gladding, 42

F.2d 440 (4th Cir. 1930), and MCI Constructors, Inc. v. City of Greensboro, No. 04-1395, 125

Fed. Appx. 471 (4th Cir. Mar. 15, 2005) (unpublished) (citing Fulcher v. Nelson, 159 S.E.2d

519, 522 (N.C. 1968) and Mezzanote v. Freeland, 200 S.E.2d 410, 414 (N.C. Ct. App. 1973)).  In

Gladding, a contract between an automobile dealer and its supplier had different cancellation

provisions. 42 F.2d at 441-442.  The defendant terminated without notice based on the dealer's

failure to exclusively represent the supplier, but then sought to limit the damages according to

---

[6]That provision reads, in part:
We [CNA] may cancel this policy.  If we cancel because you fail to pay all premium
when due, we will mail or deliver to you not less than 10 days advance written notice
stating when the cancellation is to take effect.  If we cancel for any other reason, we will
mail or deliver to you not less than 90 days advance written notice stating when the
cancellation is to take effect. (Pl. Ex. 17 at BR 00005915).

another provision which allowed cancellation with sixty days' notice where a question arose

which threatened the mutually satisfactory business relationship. Id. at 444-445. The jury found

that the defendant was not justified in terminating the agreement. The Fourth Circuit affirmed

the trial court's decision not to submit the sixty-day damage limitation to the jury, reasoning:

> While the contract might have been terminated for various reasons before its
> performance was completed, the [defendant] eliminated those reasons when it
> elected to cancel for the reasons assigned, which the jury found groundless.

Id. at 445. Thus, the court found the defendant elected to terminate for reasons other than the

sixty-day cancellation provision, did not plead it as a defense, and could not thereafter use it to

limit damages. Id.

In MCI Constructors, the Fourth Circuit held that the general rule in North Carolina is

that where a contract confers on one party a discretionary power affecting the rights of the other

party, the contract is not illusory so long as the discretion is exercised in an objectively

reasonable manner. 125 Fed. Appx. at 477. Thus, CNA's discretion to terminate the contract was

limited by North Carolina's requirement of objective reasonableness, as was its decision to

increase the renewal rates. The jury's determination that CNA was liable because its decision to

increase the renewal rates was not objectively reasonable necessarily foreclosed CNA's exercise

of the cancellation clause and the limitation of damages to the ninety-day period applicable to

that clause.

CNA now supplements the employment-at-will decisions provided in its pre-trial briefs[7]

with Mark Seitman and Assoc., Inc. v. R.J. Reynolds Tob. Co., 837 F.2d 1527 (11th Cir. 1988),

---

[7]See e.g. Bloch v. Paul Revere Life Insurance Co., 547 S.E.2d 51 (N.C. Ct. App. 2001)
(court properly limited the damages of an at-will employee to the 30-day period of required
notice in his employment contract).

and Trimed, Inc. v. Sherwood Medical Co., 977 F.2d 885 (4th Cir. 1992). In Mark Seitman and

Assoc., a five-year agreement gave a defendant the discretion to avoid performance of future

contract years with notice by March 1 of the current contract year. 837 F.2d at 1528. Mid-way

through one of the contract years, the plaintiff terminated the agreement. Id. The jury returned a

verdict in favor of the plaintiff on his claim that the contract was wrongfully terminated. Id. at

1529-1530. There was no dispute that the jury properly awarded lost profits and close-down

costs between the early termination in December and the March deadline for notice regarding the

following contract year.[8] However, the Eleventh Circuit found that the trial court improperly

allowed the jury to compensate the plaintiff for the loss of his business as a going concern. Id. at

1532. Here, no damages were awarded based on any loss of business value of SOI, but rather

were limited to the costs of obtaining replacement insurance for the time period covered by the

agreement. Additionally, CNA never issued a notice of cancellation, but rather allowed SOI's

policy to expire when SOI chose not to renew at the increased rates offered by CNA. (John

Glancy, Vol. II TR at 464-466). Therefore, Mark Seitman and Assoc. does not alter the Court's

previous ruling.

Trimed involved a distributorship agreement governed by New York law, which gave

each party the right to terminate the contract for cause with thirty days' notice, and without cause

_____

[8]Thus, the quoted language from the opinion in CNA's motion regarding this limitation
on damages (Doc. No. 168: Motion at 42) was not necessary to the holding that damages for loss
of business value were improper. There, the Eleventh Circuit relied on two North Carolina cases
holding that contracts of indefinite duration may be terminated at will with reasonable notice.
Mark Seitman and Assoc., 837 F.2d at 1532 (citing General Tire & Rubber Co. v. Distributors,
Inc., 117 S.E.2d 479 (N.C. 1960), and City of Gastonia v. Duke Power Co., 199 S.E.2d 27 (N.C.
Ct. App. 1973). The Court is not persuaded that the limited holding of those cases has
application to the instant contract, which was not of indefinite duration and was not terminable at
will.

with six months' notice.[9] 977 F.2d at 892-893. The jury concluded that the defendant terminated the agreement without cause and there was no dispute that the damages were limited to the six-month period following termination.[10] Id. Here, as noted above, the contract was not of indefinite duration and could not be terminated without cause. North Carolina law required CNA's decision to be objectively reasonable, whether it increased the renewal rates or terminated the agreement. Because the jury found CNA's decision was not objectively reasonable, the cancellation clause's ninety-day notice period could not have been triggered, and, thus, could not limit SOI's damages. Therefore, SOI was entitled to recover the costs for replacement insurance for the remainder of the agreement, and no miscarriage of justice occurred when the Court refused to limit the damages to the ninety-day period applicable to the cancellation clause.

     5.     Exclusion of Evidence and Argument About Extension Agreement

CNA complains in its motion that the Court erred in its pre-trial Order (Doc. No. 132) limiting argument and evidence relating to the extension agreement.[11] (Doc. No. 163: Motion at ¶ 18(c)). CNA has not provided any new grounds to alter the Court's holding that the extension agreement did not satisfy or modify the original contract (Doc. No. 108: Order at 6-9) and its exclusion at trial of evidence and argument to establish that point with the jury (Doc. No. 131: TR at 4-6).

---

[9]There is no indication in the opinion that the contract had a definite duration.

[10]In contrast to Mark Seitman and Assoc., decided under North Carolina law, the Fourth Circuit determined New York law allowed for damages for loss in value of the business as a going concern. Trimed, 977 F.2d at 893.

[11]CNA did not address this contention in its supporting Memorandum or Reply. It had asserted the issue prior to trial in its Answer (Doc. No. 6 at 5) and Motion for Summary Judgment (Doc. No. 47 at ¶ 2) stating that the extension agreement constituted an "accord and satisfaction" or modification of the original contract.

6.     Inclusion of Admin and Solomon Restaurants in Damages Calculation

Finally, CNA argues that the jury improperly included damages for the discount programs because the Admin and Soloman Restaurant deals were one-year, not three-year arrangements. (Doc. No. 163: Motion at ¶ 14).  CNA presented documentary evidence, including unsigned confirmation agreements, insurance applications, and email messages (Def. Ex. 89, 96, 99, 108, and 112), in an attempt to prove the discount program expired January 1, 2000.  SOI presented evidence, including deposition testimony from Jaqueline Bowmar, who authored the cover letters to Def. Ex. 99 and 108, that the discount program was to expire on January 1, 2001, at the same time as higher-priced base program. (Vol. III TR at 831-832).  The Court instructed the jury that each party had the burden of proving its version of the contract, through signed agreement, other documents, oral statements, or conduct of the parties. (Vol. VI TR at 1908).  In light most favorable to SOI, the Court finds there was sufficient evidence to support the jury's decision to include the discount programs in the damages calculation. Fed. R. Civ. P. 50.  Additionally, considering the weight of the evidence, the Court finds that the verdict was not against the clear weight of the evidence, based on false evidence, or resulted in a miscarriage of justice; therefore, neither a new trial nor remittitur of damages is required. Fed. R. Civ. P. 59.

C.     SOI's Motion (Doc. No. 166)

In its motion for judgment as a matter of law, or, in the alternative, for new trial, SOI essentially raises four issues: (1) a statute of limitations defense to SOI's underpayments from 1996 to 1998 (Doc. No. 166: Motion at 3-5); (2) the sufficiency of the evidence to establish a minimum payroll requirement for the base program (Motion at 6-10); (3) a miscalculation of the damages attributable to the discount Admin program (Motion at 11); and (4) the Court's requirement that SOI prove future damages at trial (Motion at 14-16).

1.      Statute of Limitations Defense

SOI asserts that the counterclaim award should be modified to strike time-barred claims for underpayments between 1996 and 1998.[12] (Doc. No. 166: Motion at 3-5).  Prior to trial, SOI moved for summary judgment on CNA's statute of limitations defense. (Doc. No. 45).  SOI argued that continued negotiations between the parties to maintain coverage under the contract delayed triggering the three-year limitations period until CNA unilaterally announced that coverage had ended. (Doc. No. 46: Memorandum at 9-10).  The Court agreed with SOI and held "[t]he statute begins to run on the date the promise is broken." (Doc. No. 108: Order at 4) (quoting Penley v. Penley, 332 S.E.2d 51, 62 (N.C. 1985) (internal quotations omitted)).  Thus, there was not a triggering event until CNA unequivocally refused to perform. (Doc. No. 108: Order at 6).

Similarly, CNA presented evidence at trial that the parties continued to negotiate during their relationship about overpayment and underpayment based on payroll audits and revised audits, some of which were not finalized until years after the corresponding policy period ended. (Troy Garris, Vol. V TR at 1281).  Former SOI CFO John Thigpen and current CFO Michael Willson each admitted that their goal was to resolve all the policy years together. (Vol. V TR at 1374; Vol. VI TR at 1694).  In fact, Mr. Willson conceded that SOI owed CNA money for the years 1996 to 1998, but did not pay because the parties were attempting to reconcile all the policy years together. (Vol. VI at 1693-94).  Mr. Garris, CNA's billing services manager responsible for the SOI account, testified that he expected SOI to pay until it filed its lawsuit. (Vol. V TR at

---

[12]SOI admits that CNA correctly calculated the amount of underpayment, with the exception of a minor amount of premium attributable to the Admin program in 1998.  As will be addressed, CNA did not seek damages for the underpayment attributable to that program.

1299).  Mr. Willson confirmed that he never communicated to CNA an intention not to pay for the previous years because it was too late.[13] (Vol. VI at 1694).

The Court instructed the jury that the three-year limitations period would begin to run when either party gave clear and certain notice of its intention not to pay. (Vol. VI at 1908-1909). The jury returned a verdict for CNA regarding SOI's underpayment. (Doc. No. 151: Verdict at ¶ 3(b)).  Viewing the evidence in light most favorable to CNA, the jury's implicit finding that CNA's counterclaim seeking damages for underpayments during the policy years between 1996 and 2000 (Doc. No. 6: Answer at 6) was filed within the limitations period after SOI gave clear notice of its intent not to pay and sought damages for overpayment with the filing of this action (Doc. No. 1: Complaint at ¶ 29) was reasonable and supported by sufficient evidence. Additionally, the verdict was not against the clear weight of the evidence, and did not result in a miscarriage of justice, particularly considering SOI's admission that it owed money to CNA, but did not pay as part of a process of on-going negotiations between the parties. Fed. R. Civ. P. 59.

### 2.      Minimum Payroll for the Base Program

The jury awarded damages on the counterclaim in keeping with CNA's position that the base program for policy year 1999 was subject to a minimum payroll requirement. (Compare Doc. No. 151: Verdict at ¶ 3(b)(1) with Def. Ex. 519 and Troy Garris, Vol. V TR at 1296-1298).

---

[13]Thus, an instruction on the defense of laches was not warranted by the evidence.  SOI showed no prejudice from delay that would make it inequitable or unjust for CNA to assert its claim for underpayment. Young v. Young, 259 S.E.2d 348, 351 (N.C. Ct. App. 1979)(describing defense of laches).

SOI disputes that sufficient evidence established a minimum payroll term in the 1999 agreement.[14] (Doc. No. 166: Motion at 6-10).

As detailed above in Section II.B., the parties presented conflicting evidence regarding whether the 1999 policy year was subject to a minimum payroll requirement. In light most favorable to CNA, it was reasonable for the jury to find a minimum payroll term applied. Fed. R. Civ. P. 50. Jaqueline Bowmar testified that CNA was concerned that SOI would not meet its projected $275 million in payroll in the base program, so it required a $250 minimum payroll in that program over a twelve-month period. (Vol. III TR at 849-850; see also Def. Ex. 83 and Pl. Ex. 230 at CNA 006542).[15] Even so, CNA provided a waiver of the minimum if SOI provided timely audits. (Pl. Ex. 230 at CNA 006547).

---

[14]SOI also claims that the amount of prejudgment interest was not established by sufficient evidence. (Doc. No. 166: Motion at 13-14). North Carolina law requires that prejudgment interest be awarded in a contract case, but does not require that a jury determine the amount because computing the amount is "a mere clerical matter." Dailey v. Integon General Ins. Corp., 331 S.E.2d 148, 158-159 (N.C. Ct. App. 1985). When a jury does determine the award, it is required to distinguish between principle and interest, Id. at 159, which was done in this case (Doc. No. 151: Verdict at ¶ 3(b)(2)). It appears the jury calculated the interest from the date SOI's complaint was filed in December 2002, which CNA argued was the date SOI breached its obligation to resolve the underpayment. SOI has not shown evidence that another date would have been more appropriate or that the jury's math was incorrect. Therefore, this issue is without merit.

[15]Thus, SOI's defense that it maintained a total payroll exceeding $250 million in the three programs combined and in the base program over a fourteen-month period (Doc. No. 166: Motion at 8-10) is without merit. The testimony and documentary evidence regarding the minimum payroll term showed that it only applied to the base program with a $3.40 rate over twelve months. SOI's argument (Doc. No. 194: Reply at 6) that a clause in the unsigned confirmation agreement referring to the adjustment of "all rates" as showing the inclusion of the discount programs (Pl. Ex. 230 at CNA 006548) is contradicted by an earlier page in the document showing five rates for items such as administrative fee, claims service fee, and prepayment fund totaling $3.40 (Pl. Ex. 230 at CNA 006541). The next page notes these rates are subject to a minimum $250 million payroll. (Pl. Ex. 230 at CNA 006542). Therefore, the jury could reasonably conclude that the "all rates" language referred to those comprising the base program total rate.

The risk became real in 2000 when SOI retroactively reclassified payroll from the base program into the discount program. (John Thigpen, Vol. V TR at 1364). The initial audit of $285 million payroll in the base program was reduced to $238 million in the final audit. (Troy Garris, Vol. V. TR at 1294; Def. Ex. 352). Because the base program was significantly more expensive,[16] the payroll shift to the discount program resulted in SOI owing $1.4 million less in premium to CNA. (Troy Garris, Vol. V. TR at 1294; see also John Thigpen, Vol. V TR at 1365 (reclassification "probably" resulted in a $900,000 reduction in premium)). Additionally, SOI did not provide quarterly audits as required. (Troy Garris, Vol. V. TR at 1344-1345, 1349).

In response, CNA accepted SOI's reclassifiaction numbers, but calculated the premium due for the 1999 base program with a minimum payroll of $250 million. (Troy Garris, Vol. V. TR at 1295-1296). Although SOI presented testimony from its officers that they did not think a minimum payroll term applied to the deal (William Michel, Vol. II TR at 502; John Thigpen, Vol. V TR at 1361), Mr. Garris testified that those same individuals did not protest his application of the term (Troy Garris, Vol. V. TR at 1350). Thus, substantial evidence supported the jury's verdict.

Considering the weight of the evidence, the Court further finds that the jury's verdict was not against the clear weight of the evidence, was not based on false evidence, and did not result in a miscarriage of justice. Fed. R. Civ. P. 59. SOI received the benefit of reducing the premium by utilizing the discount programs, but remained obligated to the minimum payroll term applicable to the 1999 base program when its payroll fell below $250 million and it did not

---

[16]The base program cost $3.40 per $100 of payroll, but the Soloman Restaurant program cost $1.70 and the Admin program cost between $0.40 and $0.75 per $100 of payroll.

provide timely audits.  Accordingly, the Court will not disturb the jury's verdict in favor of CNA on the counterclaim.

### 3. Inclusion of Admin Program in Counterclaim Damages

SOI claims the jury's award to CNA should be reduced by $41,876 because an invoice sent by CNA factored a rate of $0.79 instead of $0.49 for the 1998 Admin program. (Doc. No. 166: Motion at 11).  The 1998 agreement (referred to as "Amlease") required SOI to make premium deposits at a rate of $0.79 per $100 of payroll. (Pl. Ex. 74).  Clients with manual rates of $1.50 or less qualified for the program, and CNA agreed to charge a premium of 50% of the manual rate. (Pl. Ex. 74).  Accordingly, SOI CEO Robert Fotsch summarized that the maximum premium that could be charged was $0.75. (Vol. I TR at 124-125).  SOI CFO Michael Willson, citing a summary exhibit he created, testified that the 1998 rate should have $0.49.[17] (Vol. VI TR at 1668; Pl. Ex. 352).  Thus, there was a conflict in the evidence of whether $0.79 or $0.49 was the correct rate, resulting in an over-billing of either $.04 or $.30 per $100 of payroll.  SOI points to no proof, however, that it actually paid CNA based on the invoice.[18]

The Court finds that any dispute about the Admin program rate did not affect the jury's determination of the counterclaim damages.  As detailed above, the jury apparently adopted CNA's calculation detailed in Def. Ex. 519 regarding underpayments by SOI.  Troy Garris, who created that exhibit to summarize his calculations, testified that he factored payroll times the $3.40 rate, which was applicable only to the guaranteed cost base program. (Vol. V TR at 1285,

[17]SOI also relies on Pl. Ex. 6, which is a broker letter negotiating the base program rate, not the Admin program rate.

[18]Thus, SOI's argument (Doc. No. 194: Reply at 9) that it overpaid for the Admin program is not supported by the evidence.

1341).  This testimony limiting damages to those incurred in the base program was corroborated

by the drastic reduction in damages sought by CNA, from over $2 million in the Counterclaim

(Doc. No. 6 at 6), to approximately $1.3 million in its interrogatory response (Pl. Ex. 380), to just

over $600,000 at trial (Def. Ex. 519).  SOI highlighted this reduction during the cross-

examination of Mr. Garris. (Vol. V TR at 1333-1334).  Therefore, the jury's verdict on the

counterclaim was supported substantial evidence regarding underpayments on the base program,

and was not affected by any billing error on the Admin program. Fed. R. Civ. P. 50.  Because this

determination was not against the clear weight of the evidence, and did not result in a miscarriage

of justice, a new trial is not warranted based on this issue. Fed. R. Civ. P. 59.

4.      Future Damages

In its trial brief, SOI expanded on its request for "other and further relief" in its

Complaint to seek a declaratory judgment that CNA was responsible to indemnify SOI for future

additional costs associated with several open claims under the replacement Hartford insurance

program. (Doc. No. 124 at 18-20).  The Court denied SOI's request for declaratory judgment, but

allowed SOI the opportunity to present evidence about the open claims to the jury. (Vol. IV TR at

1124-1125).  In the instant motion to reconsider that ruling (Doc. No. 166: Motion at 14-16),

SOI has largely restated its earlier argument with the addition of a citation to ABT Building

Products Corp. v. National Union Fire Insurance Co., No. 5:01cv100 (Doc. No. 204: Amended

Judgment) (W.D.N.C. Sept. 30, 2004), aff'd, — F.3d —, 2006 WL 3718088 (4th Cir. Dec. 19,

2006). (Doc. No. 194: Reply at 31).  In that case, the jury returned a verdict finding that certain

claims in a class-action lawsuit were covered by the insurance policy at issue.[19] (Doc. No. 194: Reply at Ex. C: Amended Judgment at 3).  Based on that determination, the court ordered the defendant to pay the future costs of those claims for which the jury found it liable. (Doc. No. 194: Reply at Ex. C: Amended Judgment at 6).

Here, SOI did not attempt to prove the particular open claims,[20] nor did SOI seek a jury determination of CNA's liability for those alleged claims. (Doc. No. 121: Proposed Instructions; Doc. No. 149: Memorandum on jury instructions).  Accordingly, this case is critically different from ABT because the jury did not find CNA liable for any open claims.  If the Court were to impose such liability after SOI passed on its opportunity prove its case at trial, the Court would infringe on CNA's Seventh Amendment right to a jury's determination of whether the open claims were properly covered by the replacement Hartford insurance program. Maher v. Continental Casualty Co., 76 F.3d 535, 541 n.6 (4th Cir. 1996) (insurer constitutionally entitled to jury trial where insured sought money damages).  Therefore, the Court will not alter the judgment to declare CNA liable for the future costs of any open claims.

---

[19]The jury also made certain damages findings about those claims, such as amounts already paid on the claims, percentages of replacement and other costs, and the defendant's liability for administrative costs per claim. (Doc. No. 194: Reply at Ex. C: Amended Judgment at 3-4).

[20]SOI Metrics Department Manager Erik Mikeal testified generally that open claims existed that could possibly generate additional costs to SOI. (Vol. III TR at 1087).

IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that CNA's Motion for Judgment as a Matter of Law

or in the Alternative for a New Trial (Doc. No. 163) and SOI's Post-trial Motion (Doc. No. 166)

are **DENIED**.

Signed: March 15, 2007

Robert J. Conrad, Jr.
Chief United States District Judge